STATE of Iowa, Appellee,

v.

James L. MAYBERRY, Appellant.

No. 85–1879.

Supreme Court of Iowa.

July 22, 1987.

Rehearing Denied Sept. 23, 1987.

Jerald W. Kinnamon and Jon M. Kinnamon, Cedar Rapids, for appellant.

Thomas J. Miller, Atty. Gen., Pamela Greenman Dahl, Asst. Atty. Gen., and J. Patrick White, Co. Atty., for appellee.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, WOLLE, and LAVORATO, JJ.

CARTER, Justice.

Defendant, James L. Mayberry, has appealed his conviction of the offense of murder in the first degree in violation of Iowa Code section 707.2 (1985). He challenges the sufficiency of the evidence to support the jury's verdict of guilty. In addition, he claims the trial court erred by refusing to grant a bill of particulars, refusing to give requested jury instructions, admitting improper medical opinion evidence, admitting improper rebuttal evidence by the State, and denying a motion for mistrial following a comment by a State witness concerning defendant's failure to take a polygraph examination. Finally, defendant charges that his conviction is tainted because of the ineffective assistance he received from his trial counsel. We consider all of these claims and affirm the judgment of the district court.

Defendant was charged by trial information with killing Julia A. Wise on or about July 2, 1985. The information alleges the killing was perpetrated with malice aforethought and was either premeditated or occurred while defendant was participating in a forcible felony. Evidence adduced at trial indicated that the victim was a twenty-year-old woman who had moved to Iowa City from Springfield, Missouri, a few days prior to her death. She resided in a mobile home in the Hilltop Trailer Court in Iowa City. Her mobile home was located next to that in which Mark Berger, the brother of defendant's wife, resided.

On July 4, 1985, the victim's parents, who lived in Springfield, Missouri, became concerned that their daughter was not answering her telephone during their repeated efforts to contact her. Prompted by this concern, her mother telephoned the manager of the Hilltop Trailer Court and asked him to contact their daughter. Upon going to Julia Wise's mobile home about 1:45 p.m. on July 4, the manager observed her car parked near the unit. When she did not answer his knock on the door, he entered the mobile home and found her nude body on the floor. She had been stabbed to death.

The victim's clothing had been cut from her body. Her glasses were found nearby, and a bruise on her face indicated that the glasses had been jammed against her nose by a forceful blow. A bloody towel, later identified as the victim's property, was later located underneath Mark Berger's mobile home.

Defendant was present at the Berger mobile home later on July 4 when detectives on the Iowa City Police Force canvassed the victim's neighbors. He told the detectives that although he, too, had formerly lived in Springfield, Missouri, he had not known Julia Wise prior to her move to Iowa. He indicated that he had first met her on July 2 while waiting for Mark Berger outside the latter's mobile home. He also volunteered the fact that he had seen the victim alive between 7:00 and 7:30 p.m.

on July 2. When questioned about this, he indicated that he had talked to her briefly outside her mobile home and she had given him a glass of water. He stated that he had last seen her when he knocked on her door and handed her the empty glass.

Defendant was questioned further on July 6 by officers of the Iowa City Police Department and the Iowa Division of Criminal Investigation. On this occasion, he told the officers that, in addition to accepting a glass of water from Julia Wise outside her mobile home, he had entered the mobile home for about ten minutes to assist her with a malfunctioning television set. Defendant stated that this was done at her request after he had told her that he was employed by an electronics firm. When questioned concerning objects he might have touched in the mobile home, he indicated that he might have touched a beer can, a water glass and the television set.

The officers obtained a set of defendant's fingerprints at the time of the July 6 interview. A comparison with the fingerprints found in the victim's mobile home revealed that defendant's fingerprints were present on a green drinking glass, on the front side of the right lens of the victim's eyeglasses found near her body, and on the blade of a kitchen knife found in the mobile home. That knife could not be identified as the murder weapon.

On July 10, defendant was again questioned at the Iowa City Police Department by officers of that department and the Iowa Division of Criminal Investigation. The officers advised him that they had physical evidence indicating his presence in the mobile home and some contact with the victim. According to the officers, defendant told them that, when he entered the mobile home to examine the television set, Julia Wise had shown him through the mobile home and they had started hugging and kissing in the bedroom area. He stated that he touched her breasts and vaginal area but decided against having sexual intercourse. The officers also claimed that, later in the same interview, defendant told them he had become angered by a remark made by the victim and he had hit her with his open hand, knocking her to the floor. He did not admit to any further acts of violence toward the victim.

In his trial testimony, defendant denied having struck the victim at any time and denied having told the officers that he did so. He explained his fingerprints on the victim's glasses by indicating that at one point when he was fixing the television set she asked him to hand her glasses to her from a nearby countertop.

Dr. Victor Edwards, deputy county medical examiner, viewed the body of the victim at the mobile home on the afternoon of July 4. He directed that the body be moved to Mercy Hospital so that an autopsy could be performed. He estimated, based on his visual observation of the condition of the body and the odors present in the mobile home that death had occurred twenty-four to forty-eight hours prior to the afternoon of July 4. Dr. William J. Powers, a pathologist, performed an autopsy on the victim's body. He identified several knife wounds on the body and concluded that one particular stab wound to the heart was the cause of death. Because of the ninety-degree temperatures which prevailed both inside and outside the mobile home, Dr. Powers could only estimate the time of death. He, like Dr. Edwards, estimated that death had occurred not less than twenty-four hours nor more than forty-eight hours before the late afternoon of July 4.

Peter Jingst and Sharon Patterson, friends of the defendant, testified that they were present at Mark Berger's mobile home at 11:00 p.m. on July 2, that defendant's car was not present at that time, and that Julia Wise's car was not parked at her mobile home. Charles Eckman, a witness for the State, testified that the victim's car was parked by her mobile home at 12:30 a.m. on July 3. Mark Berger's wife testified that she returned from her job at University Hospitals at 1:45 a.m. on July 3. At this time, Julia Wise's car was not present at the mobile home. When she looked out approximately forty-five minutes later the car was still not there.

Other evidence offered at trial included testimony from defendant's wife that, upon defendant's return home around 10:40 p.m. on July 2, he connected the plumbing on a newly acquired automatic washing machine and immediately washed the clothes which he had been wearing. This clothing was defendant's work uniform. The evidence indicated that defendant's employer provided a laundry service which defendant ordinarily used for these uniforms. Defendant's wife also testified that she observed a white substance, which she believed to be semen, in the crotch of the pants which were washed. She also noticed that the pocket on the smock shirt of the uniform was torn. Additional facts bearing on the issues presented will be stated in connection with our discussion of the applicable law.

## I. *Sufficiency of Evidence of Guilt.*

The first issue which we consider is defendant's claim that the evidence is insufficient to sustain a finding of guilt under the correct constitutional standard. In making this argument, defendant correctly notes that the due process clause of the fourteenth amendment to the federal constitution protects the accused in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970). The correct test in the application of this requirement is whether, considering all of the record evidence in the light most favorable to the prosecution, a rational trier of fact could be convinced of defendant's guilt (and all essential elements of guilt) beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979).

Defendant's challenge to the sufficiency of the evidence may be divided into two separate arguments. The first relates solely to the evidence involving the identity of the perpetrator of the crime. The second relates to the sufficiency of the evidence of the elements of first-degree murder under both of the alternative theories presented by the State, *i.e.,* willful, premeditated killing and killing while participating in a forcible felony. We separately consider the arguments involving these two categories of proof.

A. *Identity of the perpetrator.* Defendant argues there is no direct evidence that he was the perpetrator of the crime and that the circumstantial evidence is entirely inconclusive. His argument in this respect is aided somewhat by the rather imprecise nature of the evidence concerning the time of the victim's death.[1] Defendant urges that such imprecision minimizes the effect of his presence at the victim's mobile home on the evening of July 2, particularly in view of other evidence that the victim's car was gone subsequent to the time he had left her residence and returned home.

Notwithstanding these weaknesses in the State's proof, we find the evidence is sufficient under the *Jackson v. Virginia* standard to support a finding by the jury that defendant was the killer. The jury was not required to believe the evidence of the absence of the victim's car following defendant's departure. Included in the evidence presented are several circumstances tending to connect defendant with the perpetration of the crime. His fingerprint was found on the victim's eyeglasses, which were on the floor near the body. A bruise on the victim's face indicated that she had been struck in a manner which jammed the glasses into the bridge of her nose.

---

1. In a related argument on the medical testimony concerning time of death, defendant asserts that the evidence was inadmissible opinion evidence not based on an adequate foundation. We have reviewed these contentions and find that the challenged evidence was properly received by the court under Iowa R.Evid. 702 as "other specialized knowledge" which would assist the trier of fact to determine a fact in issue. *See State v. Barrett,* 401 N.W.2d 184, 191 (Iowa 1987). We also reject defendant's claim that the medical examiner's report was not admissible under Iowa Code § 331.802(6) (1985). The cover letter admitted with the report was an integral part thereof.

A bloodstained towel belonging to the victim was found under the Berger mobile home where defendant had been present on the evening of July 2. Defendant's insistence on washing his work uniform upon returning home on the evening of July 2 rather than availing himself of his employer's laundry service is another factor suggesting guilty knowledge. Finally, the three separate statements made by defendant to the police evidence a pattern of withholding important information and changing the facts only when confronted with inconsistencies between his story and the physical evidence. Based on all the evidence presented, we conclude that the jury could logically infer that defendant was the perpetrator of the crime. *See, e.g., State v. Blair*, 347 N.W.2d 416, 421–22 (Iowa 1984).

B. *Evidence of the elements of first-degree murder.* The State asserted alternative elements of first-degree murder. These were willful, premeditated killing and killing while participating in a forcible felony. Defendant urges that under either theory the evidence is insufficient to support a finding of first-degree murder. We disagree.

■ In *Waterbury v. State*, 387 N.W.2d 309, 312 (Iowa 1986), we reviewed our prior decisions involving whether a jury may properly draw inferences of malice, deliberation, premeditation and specific intent to kill from the use of a deadly weapon with opportunity to deliberate. We suggested that the existence of a prima facie showing based upon inferences to be drawn from facts proven depends upon whether the state of affairs sought to be established may usually and generally be inferred from the facts shown. *Id.* at 312. We reaffirmed the view that under this standard the use of a deadly weapon with opportunity to deliberate permits an inference of a willful, premeditated killing. *Id.* at 312.

*See also State v. Lass*, 228 N.W.2d 758, 765–66 (Iowa 1975).

In the present case, the evidence reflected that multiple stab wounds were inflicted on the victim during the course of a crime which involved the cutting of her clothing from her body. While the strength of the permissible inferences under our *Waterbury* and *Lass* decisions will necessarily vary from case to case, we believe the inferences which might permissibly be drawn from the facts proved in the present case are sufficient to sustain the verdict of first-degree murder under the first alternative theory charged in the information.

■ The jury was also instructed that it could find the defendant guilty of first-degree murder if the killing occurred while defendant was participating in the forcible felony of assault with intent to commit sexual abuse causing serious injury. Defendant contends that it was error to submit that alternative to the jury because it was lacking in evidentiary support.[2] Again, we disagree. There was unmistakable evidence of an assault. The manner in which the victim's clothing was cut from her body strongly suggested a sexual assault. The intent to cause serious injury may be inferred under the usual premise that, although intent is seldom subject to direct proof, defendants will ordinarily be viewed as intending the natural and probable consequences which ordinarily follow from their voluntary acts. *State v. Rinehart*, 283 N.W.2d 319, 322–23 (Iowa 1979), *cert. denied*, 444 U.S. 1088, 100 S.Ct. 1049, 62 L.Ed.2d 775 (1980).

As a final argument on the sufficiency of the evidence, defendant contends that the felonious assault merged in the elements of second-degree murder and therefore could not be used to elevate the charge to first-degree murder. We rejected the legal premise upon which this argument is based in *State v. Beeman*, 315 N.W.2d 770, 776–

---

**2.** The State assumed a *mens rea* burden somewhat greater than necessary by designating the underlying felony as a felonious assault under Iowa Code § 709.11 (1985) rather than designating the felony as sexual abuse under Iowa Code §§ 709.2, .3, or .4 (1985) and relying on the expanded definition of "participating" contained in Iowa Code § 702.13 (1985). The defendant cannot complain that the State assumed and satisfied a greater burden than was necessary under the facts of the case.

77 (Iowa 1982). The evidence was sufficient to support the finding of the jury.

## II. *Denial of Bill of Particulars.*

■ The trial information was filed July 19, 1985. Defendant's motion for bill of particulars, filed on August 1, 1985, was denied by the district court. Defendant urges on appeal that the motion should have been granted so as to require the State to specify the forcible felony on which it was relying to sustain its alternative theory of first-degree murder.

Although we agree that defendant was entitled to know the forcible felony relied on by the State, we find no fault in the district court's ruling on defendant's motion for bill of particulars. The motion contains no request that defendant be apprised of the particular forcible felony upon which the State's felony murder charge was based. As a result, that claim was not adequately called to the trial court's attention.

■ Ordinarily, trial courts have a great deal of discretion in ruling on requests for a bill of particulars. *State v. Doss,* 355 N.W.2d 874, 880 (Iowa 1984). The test is whether defendant is sufficiently apprised of the charge against him. *Id.* at 881. In the present case, defendant filed a motion three weeks prior to commencement of the trial, seeking permission to explore the victim's sexual history. Statements contained in the motion reflect his knowledge of the State's theory concerning the "forcible felony" alternative for proving first-degree murder. We find no error in the denial of the bill of particulars.

## III. *Voluntariness of Defendant's Statements in Interviews of July 6 and July 10.*

■ Defendant asserts that the trial court erred in denying his motion to suppress the statements he made to police officers during the interviews of July 6 and July 10. He contends that these statements were involuntary.

Because these arguments present factual questions surrounding alleged violations of constitutional rights, we review the facts de novo. *See Fryer v. State,* 325 N.W.2d 400, 407 (Iowa 1982); *Hamann v. State,* 324 N.W.2d 906, 909 (Iowa 1982); *Kellogg v. State,* 288 N.W.2d 561, 563 (Iowa 1980). In the present case, the defendant does not challenge the voluntariness of the waiver of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), except as he claims this may have been the product of promises of leniency. The district court found there had been no promises of leniency, and we uphold that determination upon our review of the evidence.

■ Because detailed *Miranda* warnings were given and a written waiver of rights voluntarily obtained from defendant prior to the initiation of both the July 6 and July 10 interviews, it is not significant whether or not the interrogation which followed be characterized as custodial or noncustodial. The rules for determining voluntariness subsequent to valid *Miranda* warnings are the same regardless of the characterization of the setting in which the interrogation took place. The evidence of how defendant's interrogation was conducted in the present case supports the trial court's finding that his statements were the product of an essentially free and unconstrained choice and that his will was not overborne nor his capacity for self-determination critically impaired. *See State v. Whitsel,* 339 N.W.2d 149, 153 (Iowa 1983).

■ Although defendant contends that he erroneously believed that having once signed the *Miranda* waiver he was not free to thereafter halt the interrogation, it was not necessary that he be apprised of that right in order to satisfy *Miranda. See, e.g., State v. McGhee,* 280 N.W.2d 436, 441–42 (Iowa 1979), *cert. denied,* 444 U.S. 1039, 100 S.Ct. 712, 62 L.Ed.2d 674 (1980). Defendant claims that at a certain point he did request that the interrogation cease but that this plea went unheeded. The trial court heard the testimony of the witnesses present at that time. The court credited the testimony of the interrogating officers that defendant had in fact never requested that the interrogation be terminated.

Upon our review of the evidence, we uphold the findings of the district court on these issues of fact. We find no basis for reversal with respect to the trial court's ruling on the admissibility of statements given by defendant in the July 6 and July 10 interviews.

IV. *Failure to Instruct Jury that it Could Draw Inference Favorable to Defendant From Circumstances of His Failure to Flee From Prosecution.*

■ The defendant submitted a proposed instruction which would have told the jury in substance that if it found defendant did not flee for the purpose of avoiding or retarding prosecution such "nonflight" might be considered as a favorable circumstance in determining guilt or innocence. The trial court refused to give such instruction. Defendant assigns this ruling as error.

The premise upon which this claim of error is based is that trial courts routinely act, at the request of the State, to instruct juries that *unfavorable* inferences may be drawn with regard to accused persons who flee from an area of alleged criminal involvement. Defendant urges that in the interest of fairness a defendant is entitled to instructions telling the jury that it may draw *favorable* inferences from the absence of flight.

We have recently expressed our disapproval of routinely instructing juries that adverse inferences may be drawn from flight. *State v. Marsh,* 392 N.W.2d 132, 133–34 (Iowa 1986). We have no desire to encourage what we view as an overutilized area of trial court commentary on evidence by approving "nonflight" instructions. Such instructions will almost invariably involve selective comments on the evidence by the trial judge. This is a practice which is not favored in instructing juries and is fraught with potential for abuse. We conclude that the trial court acted correctly in refusing to give the requested instruction.

V. *Admissibility of Testimony Offered by State as Rebuttal Evidence.*

■ We next consider defendant's contention that the district court erred in permitting the testimony of witnesses called by the State in rebuttal. His principal area of complaint appears to be that the identity of these witnesses had not been disclosed to the defense. It is not required that the name of a witness who testifies in rebuttal be endorsed on the indictment or information. *State v. Bakker,* 262 N.W.2d 538, 543 (Iowa 1978); *State v. Nelson,* 261 Iowa 204, 208–09, 153 N.W.2d 711, 714–15 (1967). The State need not otherwise alert the defense to its knowledge of such witnesses except as required by discovery orders. *Cf. State v. Kase,* 339 N.W.2d 157, 159–60 (Iowa 1983). The fact that testimony used in rebuttal might have been used as a part of the State's main case does not render it inadmissible as rebuttal under the foregoing rule. *Bakker,* 262 N.W.2d at 543; *Nelson,* 261 Iowa at 208, 153 N.W.2d at 714.

■ We are unable to sustain defendant's challenge to the State's rebuttal evidence within the framework of the foregoing rules. The general rule is that the trial court has a good deal of discretion in determining what is proper rebuttal testimony. *Bakker,* 262 N.W.2d at 543. All that is claimed in the present case is that "the State presented seven rebuttal witnesses, several of which were improper." In view of this lack of specificity in identifying the testimony which defendant deems to be improper rebuttal, his argument provides no basis for overturning the district court's ruling.

VI. *Denial of Mistrial for Volunteered Comment by State's Witness Concerning Defendant's Failure to Take Polygraph Examination.*

During the course of the trial, the district court admonished the prosecutor to instruct the State's witnesses that they should avoid any reference to defendant's failure to submit to a polygraph examination. Notwithstanding the prosecutor's apparent compliance with this directive, the following remarks came into the record during the testimony of a special agent of

the Iowa Division of Criminal Investigation:

[BY THE COUNTY ATTORNEY:]

Q. Did you tell him [defendant] anything as to why you wanted him to come in for additional questions? A. Yes I told him—he had already told us that he was the last person to have seen her alive.... [T]here were several questions that had arisen in the course of the investigation that we wanted to get cleared up. I told him there was basically no other way to do it but to ask him and have him explain it to us, since he had already refused a polygraph examination ....

Immediately following this answer by the witness, counsel for the defendant requested and was granted permission to move for a mistrial out of the presence of the jury. Such motion was made asserting that the evidence concerning the refusal of a polygraph examination was so prejudicial to the defense that no admonition by the court could eradicate or remove the resulting taint from the minds of the jurors. The trial court, upon the return of the jury, directed that the improper evidence be stricken from the record and that the jury disregard it. It denied defendant's motion for a mistrial.

Defendant's argument concerning the motion for mistrial is basically the same on appeal as it was in the district court, i.e., that the remark was highly prejudicial and of the type which no admonition could eradicate or remove from the minds of the jurors. As we observed in State v. Peterson, 189 N.W.2d 891, 896 (Iowa 1971), the issue is quite different from allowing inadmissible evidence to be submitted for the jury's consideration. Where, as in the present case, improper evidence has been promptly stricken and the jury admonished to disregard it, the trial court has not made an erroneous ruling on the evidence adverse to defendant. Id. at 896. We commented on such situations as follows in Peterson:

A reversal must be predicated upon the proposition that the ... answer, forbidden by the ruling on the motion in limine, was so prejudicial, its effect upon the jury could not be erased by this procedure.... Ordinarily the striking of improper testimony cures any error. Only in extreme instances where it is manifest that the prejudicial effect of the evidence on the jury remained, despite its exclusion, and influenced the jury is the defendant denied a fair trial and entitled to a reversal.

Id. at 896 (citations omitted). The principles espoused in Peterson have been reaffirmed in State v. McGonigle, 401 N.W.2d 39, 43 (Iowa 1987); State v. Brotherton, 384 N.W.2d 375, 381 (Iowa 1986); and State v. Hamilton, 335 N.W.2d 154, 160 (Iowa 1983).

Under the foregoing standard, defendant, in order to predicate a reversal of his conviction on the stricken testimony, must demonstrate that the stricken material was of a type more likely than not to implant prejudice of an indelible nature upon the minds of the jurors. Defendant asserts that we have already held in State v. Green, 254 Iowa 1379, 121 N.W.2d 89 (1963), that evidence that an accused has refused a polygraph test has this capacity for taint. The reversal in Green was based on more than one ground. The issue concerning the polygraph evidence was not subjected to analysis under the principles espoused in Peterson as we believe it now must be.

We find it difficult to draw general conclusions as to the prejudicial impact of the type of evidence improperly presented to the jury in the present case. It depends to some extent on how jurors view the reliability of polygraph examinations. More precisely we believe it turns on how jurors believe an innocent person accused of crime should respond to a request to take a polygraph examination. In focusing on these considerations, we are unable to conclude that evidence that a polygraph test has been declined is necessarily so prejudicial that the jury could not heed the court's admonition to disregard it. Accordingly, in our application of the Peterson principles, we conclude that the striking of the evidence coupled with an admonition to

the jury sufficiently cured the potential for prejudice. The unfortunate circumstance which occurred therefore provides no basis for upsetting the conviction.

### VII. *Alleged Ineffective Assistance of Counsel.*

Finally, we consider defendant's contention that his ability to receive a fair trial was frustrated as a result of ineffective assistance from his trial counsel. Specifically, he alleges that trial counsel was ineffective in failing to request a theory of defense instruction, failing to assert a "merger" defense to felony murder, failing to object to the instructions on *mens rea*, and failing to object to the lack of a requirement for unanimous agreement by the jury on any single theory of first-degree murder.

In considering these claims, we are mindful that a defense attorney's function consists of the application of professional judgment to an infinite variety of decisions in the development and prosecution of the case. *Schrier v. State,* 347 N.W.2d 657, 661 (Iowa 1984). Given the complexity of this task, the sixth amendment to the federal constitution does not require representation that is infallible. *Id.* at 661; *Karasek v. State,* 310 N.W.2d 190, 192 (Iowa 1981).

We have already considered and rejected defendant's felony murder defense based on merger of the felonious assault into the crime of second-degree murder. Rejection of that theory also disposes of his ineffective assistance of counsel claim regarding a theory of defense instruction. Defendant's contention with respect to a unanimous verdict requirement on any single theory of first-degree murder was rejected in *State v. Williams,* 285 N.W.2d 248, 270 (Iowa 1979), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980). We have examined the elements of the *mens rea* instructions which are the basis of a claim of ineffective assistance and conclude that the instructions adequately set forth the applicable legal principles. In sum, we reject defendant's assertions in the present case because we do not find enough merit in the substantive legal theories upon which they are based to support an ineffective assistance claim.

We have considered all claims advanced on the appeal and find no basis for a reversal of the judgment of the district court.

AFFIRMED.