# IN THE SUPREME COURT OF IOWA

No. 09–0142

Filed May 13, 2011

**STATE OF IOWA,**

    Appellee,

vs.

**DALEVONTE DAVELLE HEARN,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Mark D. Cleve, Judge.

Defendant seeks further review of decision affirming district court judgment finding defendant guilty of robbery, theft, and felony eluding. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, Michael J. Walton, County Attorney, and Jerald L. Feuerbach, Assistant County Attorney, for appellee.

**APPEL, Justice**.

Dalevonte Hearn was convicted after a bench trial of robbery, theft, and felony eluding. The district court found that he aided and abetted a carjacking in a Davenport Wal-Mart parking lot and then committed felony eluding by attempting to escape police officers who were responding to the scene. Hearn argues there is insufficient evidence to link him to the robbery and theft. He also argues that even if he participated in the carjacking, he had withdrawn from the scene prior to the police chase and therefore did not meet the requirements of felony eluding. The court of appeals upheld all three convictions. We granted further review.

## I. Background Facts and Prior Proceedings.

Delores Morgan was parked in the Davenport Wal-Mart parking lot on West Kimberly Road when two males approached her car, told her to get out, took her keys, and drove off in her red 1994 Pontiac Grand Am. Morgan called police on her cell phone. Davenport police officer Dennis Colclasure responded to the call. As he was driving towards the crime scene, traveling west on West Kimberly Road, he spotted a car matching the description of the stolen car pulled over for the emergency vehicles in the eastbound lane of West Kimberly Road.

With his lights and sirens already activated, Officer Colclasure made a U-turn and pointed a spotlight into the Grand Am. The Grand Am did not pull over and turned onto Division Street, following a green Oldsmobile. While on Division, the Grand Am passed the Oldsmobile. When Officer Colclasure attempted to do the same, the Oldsmobile swerved at his police car. Officer Colclasure testified that neither the Grand Am nor the Oldsmobile pulled over and both were traveling well over the speed limit. When the vehicles reached a construction zone, the

Grand Am and Oldsmobile collided. After the crash, the Oldsmobile started up again and Officer Colclasure pursued it. The Oldsmobile had a flat tire and someone, who was later identified as the defendant Dalevonte Hearn, jumped out of the car, began to run, and was apprehended by several other police officers. During Hearn's arrest, Officer James Quick suffered a laceration on his ankle. Police found the Rock Island High School I.D. of Hearn's brother in the Oldsmobile. The Grand Am had crashed into the front deck of a house and police found a pocket knife on the driver's side floorboard.

Detective Brandon Noonan interviewed Hearn shortly after Hearn's arrest. During the interview, Hearn stated that his younger brother, DeVon Hearn, and his cousin, Jacquez Dixon, were in the red car that wrecked. Hearn denied knowing anything about the Wal-Mart carjacking. Hearn also testified at trial, where he maintained that he took no part in planning or participating in the Wal-Mart carjacking. Hearn testified that he wanted to go see his girlfriend in Peoria, Illinois, he had taken his mother's car to visit family in Davenport, and he had driven by his cousin's house and saw his brother and cousin outside of the house with a red two-door Monte Carlo. He testified he did not know who was in the red Grand Am and that he began to flee the police because of outstanding warrants for his arrest in Rock Island.

Hearn was convicted after a bench trial of second-degree robbery in violation of Iowa Code section 711.3 (2009), second-degree theft in violation of Iowa Code section 714.2(2), and felony eluding in violation of Iowa Code section 321.279(3). Hearn's robbery and theft convictions were based on a finding that he aided and abetted the carjacking.

Hearn argues the district court lacked sufficient evidence to convict him of the three felonies. The court of appeals affirmed the convictions, and we granted further review.

## II. Scope of Review.

Sufficiency of the evidence challenges are reviewed for correction of errors at law. *State v. Hansen*, 750 N.W.2d 111, 112 (Iowa 2008). "The district court's findings of guilt are binding on appeal if supported by substantial evidence. Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted). To determine whether substantial evidence supports the trial court's verdict, we consider all the evidence and the record in the light most favorable to the trial court's decision. *State v. Taylor*, 689 N.W.2d 116, 131 (Iowa 2004). To support the verdict, " '[t]he evidence must be such that, when considered as a whole, a reasonable person could find guilt beyond a reasonable doubt.' " *State v. Doss*, 355 N.W.2d 874, 877 (Iowa 1984) (quoting *State v. Mulder*, 313 N.W.2d 885, 888 (Iowa 1981)). We draw all legitimate inferences in support of the verdict. *Taylor*, 689 N.W.2d at 131. However, "[e]vidence which merely raises suspicion, speculation, or conjecture is insufficient." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992).

Questions regarding the proper interpretation of a statute raise questions of law. *Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 182 (Iowa 2010).

## III. Merits.

**A. Robbery and Theft.** Hearn was convicted of second-degree robbery and second-degree theft, based on the theory of aiding and abetting. The Iowa Code provides that those who aid and abet in the commission of a public offense "shall be charged, tried and punished as

principals." Iowa Code § 703.1. To sustain a conviction under a theory of aiding and abetting, "the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission." *State v. Ramirez*, 616 N.W.2d 587, 591–92 (Iowa 2000), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 25–26 (Iowa 2001). "Knowledge is essential; however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting." *State v. Barnes*, 204 N.W.2d 827, 828 (Iowa 1972). A defendant's participation may, however, be proven by circumstantial evidence.[1] *Doss*, 355 N.W.2d at 878.

Hearn argues the evidence is insufficient to link him to the carjacking. He argues the circumstantial evidence of his actions after the crime and the fact that he saw the principals earlier that day do not provide substantial evidence to support his conviction. The State argues Hearn's convictions may be sustained because of the reasons cited by the district court: Hearn admitted to police that his brother and cousin were in the red Grand Am; Hearn stated to police that he was with his brother and cousin near the Wal-Mart shortly before the carjacking; Hearn had a motive to steal the car because he wanted to go visit his girlfriend in Peoria, Illinois, but was only able to use his mother's car for a short time period; Hearn was present near the red Grand Am; and Hearn's actions directly after the carjacking.

---

[1]Prior to 1979, we held that, if circumstantial evidence was used to prove aiding and abetting, the evidence had to pass the test of being consistent with the defendant's guilt *and* inconsistent with any rational hypothesis of his innocence. *Doss*, 355 N.W.2d at 878. We abandoned this rule in *State v. O'Connell*, 275 N.W.2d 197, 204–05 (Iowa 1979), and held circumstantial evidence is as probative as direct evidence.

A person commits theft when the person "[t]akes possession or control of the property of another, or property in the possession of another, with the intent to deprive the other thereof." Iowa Code § 714.1(1). Theft is in the second degree when the property is a motor vehicle not exceeding $10,000 in value. *Id.* § 714.2(2).

> A person commits robbery when, having the intent to commit a theft, the person does any of the following acts to assist or further the commission of the intended theft or the person's escape from the scene thereof with or without the stolen property:
>
> 1. Commits an assault upon another.
>
> 2. Threatens another with or purposely puts another in fear of immediate serious injury.
>
> 3. Threatens to commit immediately any forcible felony.

*Id.* § 711.1.

The district court held, based on the totality of the circumstances, the two individuals who took Morgan's car "intended to physically intimidate the victim into surrendering her car to them, and that they actually succeeded in placing her in fear of immediate physical contact." The district court relied on evidence of Hearn's actions before and "within minutes after" the carjacking, as well as evidence of motive, to find Hearn aided and abetted the robbery and theft of Morgan's car.

Hearn admitted to police that he had been at his cousin's house near the Wal-Mart prior to the theft of the car. Hearn also told police that his cousin and brother were the individuals in the other car when it crashed. This testimony puts Hearn with those who committed the carjacking prior to the incident and demonstrates Hearn's knowledge of who was in the Grand Am. The district court found that Hearn's inconsistent trial testimony—in which Hearn claimed he had not stopped

at his cousin's house and did not know who was in the Grand Am—was not credible.

Hearn's actions after the carjacking also provide circumstantial evidence of his guilt. Hearn was found in proximity to the scene of the carjacking (still on West Kimberly Road); he was in close proximity to the stolen Grand Am (he first drove the Oldsmobile in front of the Grand Am and then behind it); and Hearn swerved at Officer Colclasure, which the district court found was an attempt to obstruct Officer Colclasure's pursuit of the Grand Am. This evidence suggests Hearn was involved in the carjacking because he was trying to help the principal carjackers escape the scene of the crime. *See Barnes*, 204 N.W.2d at 828–29 (finding insufficient evidence of guilt where defendant did not flee the scene of his companion's crime and instead purchased cigarettes and spoke with police).

The district court also relied on circumstantial evidence of Hearn's motive. Hearn admitted he wanted to go to Peoria to see his girlfriend but that his mother had only loaned him her Oldsmobile for a limited time. The district court noted that Hearn was older than his brother and cousin and that Hearn's brother's I.D. was found in the Oldsmobile. Based on this evidence, the district court concluded that it was likely Hearn had engineered the carjacking so that he would have a car to drive to Peoria.

Evidence of a defendant's " *'presence, companionship, and conduct before and after the offense is committed'* may be enough from which to infer a defendant's participation in the crime." *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (emphasis added) (quoting *State v. Miles*, 346 N.W.2d 517, 520 (Iowa 1984)). The district court relied on Hearn's actions before and after the carjacking to find that he aided and abetted

robbery and theft. We find the circumstantial evidence provided substantial evidence to support the verdict.

### B. Felony Eluding.

1. *Overview of Issues Presented.* Iowa Code section 321.279 provides that the driver of a motor vehicle is guilty of felony eluding when the driver willfully attempts to elude a marked law enforcement vehicle driven by a uniformed officer, after a visual or audible signal to stop has been provided, by driving in excess of twenty-five miles per hour over the speed limit and "[t]he driver is participating in a public offense, as defined in section 702.13, that is a felony."[2] Iowa Code § 321.279(3)(*a*). Hearn admits he was eluding a uniformed officer in a marked vehicle after being commanded to stop by driving twenty-five miles per hour over the speed limit, but denies that he was participating in a qualifying public offense under Iowa Code section 702.13 at the time of the chase.

Iowa Code section 702.13 provides that a person is participating in a public offense until "the person has been arrested or has withdrawn from the scene of the intended crime and has eluded pursuers, if any there be." *Id.* § 702.13. Hearn argues that the State failed to present evidence sufficient to sustain a conviction for felony eluding for two reasons: (1) there is insufficient evidence that Hearn participated in the public offense of robbery or theft, and (2) even if he did participate in the carjacking, he had withdrawn from the scene before he was chased by police and therefore he had "eluded pursuers, if any there be."

We have ruled that Hearn's conviction of robbery and theft was supported by sufficient evidence on an aiding and abetting theory. As a

---

[2]The statute also applies when the offense results in bodily injury to a person other than the driver or the driver is violating Iowa Code section 321J.2 or 124.401. Iowa Code § 321.279(3)(*b*)–(*c*). These conditions are not present in this case.

result, Hearn's argument that there was insufficient evidence that he was participating in an underlying felony is without merit.

Hearn argues, in the alternative, that he had withdrawn from the scene of the crime and eluded pursuers under the statutory language of section 702.13. The State offered no evidence to show Hearn was still at the crime scene at the time of his encounter with Officer Colclasure. The evidence showed that, at the time the chase began, Hearn was traveling on West Kimberly Road some undisclosed distance from the crime scene—the Wal-Mart parking lot—and approximately fourteen minutes had elapsed after the 911 call. Therefore, the remaining question is whether Hearn had "eluded pursuers, if any there be" at the time the officers spotted the fleeing vehicles. *See id.* In order to answer this question, we must determine the meaning of the statutory phrase "eluded pursuers, if any there be." *See id.*

The State argues that, under Iowa Code section 702.13, it is sufficient that the officers involved were responding to the crime when they spotted the Grand Am, and then the Oldsmobile, on West Kimberly Road driving away from the crime scene. The State asserts the language of the statute does not require "continuous" pursuit from the crime scene. Instead, the State suggests an officer must be considered a pursuer for the purpose of the felony-eluding statute if the officer is responding in close temporal and geographic proximity to the commission of a crime. If the law were otherwise, the State claims, felony eluding would never be available when the predicate crime is carjacking because pursuit of carjackers rarely begins from the crime scene.

In contrast, Hearn offers a narrower reading of the statute. According to Hearn, in order for his conduct to be within the scope of the

prong of the statute relating to pursuers, the law enforcement officers must be in direct pursuit at the time that the accused leaves the crime scene. Hearn argues once a participant in a crime escapes the crime scene, and is not at that point in time and at that location being directly pursued, the statute is no longer applicable.

2. *Analysis.* In determining the meaning of statutes, " 'our primary goal is to give effect to the intent of the legislature.' " *State v. Anderson,* 782 N.W.2d 155, 158 (Iowa 2010) (quoting *In re Detention of Betsworth,* 711 N.W.2d 280, 283 (Iowa 2006)). "That intent is evidenced by the words used in the statute." *State v. Kidd,* 562 N.W.2d 764, 765 (Iowa 1997). "When a statute is plain and its meaning clear, courts are not permitted to search for meaning beyond its express terms." *State v. Chang,* 587 N.W.2d 459, 461 (Iowa 1998). In the absence of legislative definition, we give words their ordinary meaning. *State v. White,* 545 N.W.2d 552, 555 (Iowa 1996). In interpreting criminal statutes, however, we have repeatedly stated that provisions establishing the scope of criminal liability are to be strictly construed with doubts resolved therein in favor of the accused. *State v. Muhlenbruch,* 728 N.W.2d 212, 216 (Iowa 2007).

The starting point of interpreting a statute is analysis of the language chosen by the legislature. In order to escape liability for the crime of felony eluding, an accused must leave the scene of the crime, which admittedly occurred here, but must also have "eluded pursuers, if any there be." *See* Iowa Code §§ 321.279(3)(*a*), 702.13. A "pursuer" is defined in *Webster's Third New International Dictionary* as "one that chases or follows after." *Webster's Third New International Dictionary* 1848 (unabr. ed. 2002). Similarly, *Black's Law Dictionary* defines

"pursuit" as "[t]he act of chasing to overtake or apprehend." *Black's Law Dictionary* 1356 (9th ed. 2009).

We are convinced that the ordinary meaning of "pursuer" includes law enforcement officers who proceed in the direction of the crime scene in response to a 911 call related to the crime with the hope of apprehending criminal suspects. Under the commonly held understanding of the term, law enforcement officers racing toward the scene of a crime in response to a 911 call for assistance are "pursuers" of any suspect they encounter, even though they did not visualize the suspect at the crime scene itself and did not commence their pursuit of the suspect from the crime scene itself.

In reaching this conclusion, we note the inclusive term "pursuer" is not qualified in the statute. As a result, there is no basis for reading into the statute a narrowing requirement of "continuous pursuit commencing at the crime scene." Had the legislature intended to confine the reach of the statute in such a narrow fashion, it could have used words of limitation. *See, e.g.*, *Kidd*, 562 N.W.2d at 765–66 (holding use of "an" is unambiguous in context of crime of possession of "an" offensive weapon); *State v. Zeien*, 505 N.W.2d 498, 498–99 (Iowa 1993) (declining to limit unqualified "no right" language in property crime statute to exclude acts of domestic violence).

Further, limiting the statute to situations involving continuous pursuit of a suspect commencing at the crime scene makes no sense in light of the legislative policy manifest in the language of the statute. The purpose of the statute is evident in its terms and requires no resort to extrinsic materials. The statute recognizes that a suspect eluding law enforcement officers in a high-speed chase, after committing a serious crime, threatens innocent bystanders and other third parties with

serious harm. The threat of such serious harm occurs when the officers begin pursuit in close temporal and geographic proximity to the crime itself as well as when the officers have been in continuous bumper-to-bumper contact with the accused from the crime scene. The underlying purposes of the statute in this case do not support the distinction that Hearn seeks to draw between continuous pursuit from the crime scene and pursuit that occurs in response to a 911 call and begins in close temporal and geographic proximity to the crime. *See Muscarello v. United States*, 524 U.S. 125, 132–33, 118 S. Ct. 1911, 1916, 141 L. Ed. 2d 111, 118–19 (1998) (holding phrase "carrying a firearm" in criminal statute includes driving a car with a gun in the trunk because it would not make sense to penalize one who walks with a gun in a bag, but to ignore a similar individual who drives with the same gun in a bag in his car). The statute must not be construed in a way to defeat its plain public purpose. *State v. Peck*, 539 N.W.2d 170, 173 (Iowa 1995) (stating that statutes must be construed reasonably and in a way not to defeat their plain purpose); *State v. Nelson*, 178 N.W.2d 434, 437 (Iowa 1970) (stating that criminal statutes "are not to be construed so strictly as to defeat the obvious intention of the Legislature").

Our common sense interpretation is supported by analogy to cases involving the pursuit of felons by law enforcement officers beyond the territorial limits of the officer's political jurisdiction. An often-cited case is *United States v. Getz*, 381 F. Supp. 43 (E.D. Pa. 1974), *aff'd*, 510 F.2d 971 (3d Cir. 1975). In *Getz*, the court considered whether officers made a valid arrest outside their jurisdiction under applicable state law. *Getz*, 381 F. Supp. at 45. The officers involved were immediately dispatched to the crime scene, but before they arrived they were diverted by radio communications informing them that a vehicle matching the description

of the getaway car was sighted parked near a motel in a city outside the officers' jurisdiction. *Id.* at 45–46. The officers proceeded to the area and ultimately arrested the defendants outside their jurisdiction. *Id.* at 46. The *Getz* defendants claimed the arrest was invalid because, under the applicable statute, a law enforcement officer may make an out-of-jurisdiction arrest only if the officer "continues in pursuit of the offender after the commission of the offense." *Id.* at 45.

The *Getz* court held the terms of the statute were satisfied. *Id.* at 46. The court rejected the view that only "a fender-smashing Hollywood style chase scene would satisfy the requirement of the statute." *Id.* According to the *Getz* court, where the officers "proceeded diligently in their search for the fleeing robbers and there was no hiatus or interruption in their efforts," the requirement that the officers "continue[] in pursuit" of the fleeing felons is satisfied. *Id.*; *see also Reyes v. Slayton*, 331 F. Supp. 325, 327 (W.D. Va. 1971) (noting phrase "close pursuit" in statute related to apprehension of fleeing felons outside jurisdiction is a relative term involving time and distance and includes situation where the arresting officers began an unbroken search within minutes of a robbery and armed with a description of the perpetrator, even though they did not see accused until outside jurisdiction); *Charnes v. Arnold*, 600 P.2d 64, 66 (Colo. 1979) (en banc) (holding "fresh pursuit" does not require continuous surveillance of the suspect or uninterrupted knowledge of his whereabouts, but only continuous and uninterrupted efforts); *Cole v. United States*, 678 A.2d 554, 555–56 (D.C. 1996) (holding "fresh pursuit" does not require bumper-to-bumper chase, but only that police act diligently, from clue to clue, without interruption, to apprehend suspect); *cf. State v. Williams*, 776 So. 2d 1066, 1071 (Fla. Dist. Ct. App. 2001) (holding that there was no continuous flight from a

carjacking to a fatal collision for purposes of felony murder when defendants stopped for pizza and hung out after the carjacking).

Nothing in our previous case law under section 702.13 is inconsistent with this approach. We previously interpreted section 702.13 in *State v. Doggett*, 687 N.W.2d 97, 101 (Iowa 2004), where we held a defendant was not "participating in a public offense." In *Doggett*, the defendant's public offense was failure to appear for a trial. *Doggett*, 687 N.W.2d at 100. Ten days after failing to appear in court, he led police on a dangerous high-speed chase. *Id.* at 101. We held the defendant was no longer participating in a public offense, emphasizing the length of time since the crime (ten days), the separate location of the offense (the courtroom), and that there were no pursuers. *Id.* The facts of *Doggett* are a far cry from the facts here: there was no reasonably contemporaneous pursuit of the defendant in the approximate area of the underlying crime and in response to a police report.

In *State v. Philo*, 697 N.W.2d 481 (Iowa 2005), we also examined what constitutes "participating in a public offense." In *Philo*, the defendant refused to stop for police officers on the same day as his prior offense. *Philo*, 697 N.W.2d at 483–84. Philo had stolen a car in Buchanan County. *Id.* at 483. Later, on the same day, police in Black Hawk County ran a random license plate check on the stolen car, discovered it was stolen, and attempted to stop the vehicle, at which point Philo attempted to elude police. *Id.* at 483–84. We held Philo was no longer participating in a public offense and explained that the statute, by its terms, "is limited to withdrawal from the crime scene and is only extended beyond the crime scene in the event the accused, who has not been arrested, is pursued." *Id.* at 487. The language in *Philo* does not require continuous pursuit commencing from the crime scene, but only

requires that if liability is to attach after the accused has left the crime scene, the accused must be "pursued." *See id.* The notion that a police officer who begins chasing an accused approximately fourteen minutes after a 911 call reporting the crime and in close geographic proximity to the crime scene amounts to a "pursuer" under the statute is not inconsistent with *Philo*.

We recognize the principle of construing a statute reasonably in light of its plain purpose is sometimes in tension with the rule of lenity, which directs that criminal statutes are to be strictly construed in favor of the accused. *State v. Hagedorn*, 679 N.W.2d 666, 669 (Iowa 2004). Our interpretation of section 702.13 does not run afoul of the rule of lenity. The rule of lenity requires that ambiguous statutes imposing criminal liability be strictly construed in favor of the defendant. Originally conceived to mitigate the extension of the death penalty to many criminal acts in England, the modern purposes of the rule of lenity include providing fair notice that conduct is subject to criminal sanction, preventing inconsistent and arbitrary enforcement of the criminal law, and promoting separation of powers by ensuring that crimes are created by the legislature, not the courts. *See* John Calvin Jefferies, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 Va. L. Rev. 189, 198–201 (1985); *see also* Livingston Hall, *Strict or Liberal Construction of Penal Statutes*, 48 Harv. L. Rev. 748, 756–760 (1935). It is sometimes said that the rule of lenity is rooted in a "generic bias in favor of liberty," Dan M. Kahan, *Lenity and Federal Common Law Crimes*, 1994 Sup. Ct. Rev. 345, 349 (1994) [hereinafter Kahan], or, as Chief Justice John Marshall stated years ago, "the tenderness of the law for the rights of individuals," *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L. Ed. 37, 42 (1820). It has also been maintained that the rule of lenity is

necessary to promote democratic responsiveness in the establishment of crimes. Zachary Price, *The Rule of Lenity as a Rule of Structure*, 72 Fordham L. Rev. 885, 922 (2004) [hereinafter Price].

At the outset, we recognize there is controversy regarding the precise scope of the rule of lenity. The United States Supreme Court in recent years has embraced a relatively narrow view of the rule, commonly referred to as the *Moskal* approach (after the leading case). *See Moskal v. United States*, 498 U.S. 103, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990). Under the *Moskal* approach, the question of whether a statute is sufficiently "ambiguous" to invoke the rule of lenity is confronted only after the court has exhausted all interpretive techniques, including consideration of legislative history and other extrinsic evidence. *Id.* at 108, 111 S. Ct. at 465, 112 L. Ed. 2d at 458. Further, the Supreme Court has held the rule of lenity is applied only in cases of "grievous ambiguity." *Chapman v. United States*, 500 U.S. 453, 463, 111 S. Ct. 1919, 1926, 114 L. Ed. 2d 524, 537 (1991). The impact of the Supreme Court's formulation is that apparent textual ambiguity can be eliminated through statutory construction, and the rule of lenity applies only as a tie breaker in cases where there is no basis for choosing among plausible interpretations of a statute. Price, 72 Fordham L. Rev. at 891.

In the past, Justice Scalia has dissented from the majority approach to lenity. According to Justice Scalia, the rule of lenity should be applied toward the beginning of the interpretive process and not at the end. *United States v. R.L.C.*, 503 U.S. 291, 307–11, 112 S. Ct. 1329, 1339–41, 117 L. Ed. 2d 559, 573–76 (1992) (Scalia, J., concurring). If a criminal statute is textually ambiguous, according to Justice Scalia's *R.L.C.* concurrence, the rule of lenity applies and the statute should be given a narrow construction. *Id.* at 307–08, 112 S. Ct. at 1339, 117 L.

Ed. 2d at 573–74. According to Justice Scalia, the textual ambiguity in a statute imposing criminal liability cannot be resolved through resort to legislative history or other extrinsic materials. *Id.* at 308–09, 112 S. Ct. at 1340, 117 L. Ed. 2d at 574–75; *see also* Price, 72 Fordham L. Rev. at 891–93; Sarah Newland, Note, *The Mercy of Scalia: Statutory Construction and the Rule of Lenity*, 29 Harv. C.R.-C.L. L. Rev. 197, 198 (1994). Although Justice Scalia has not persuaded a majority of the Supreme Court to adopt his lenity framework, his plurality opinion in *United States v. Santos*, 553 U.S. 507, 514–15, 128 S. Ct. 2020, 2025–26, 170 L. Ed. 2d 912, 920–21 (2008), *superseded by statute on other grounds*, Pub. L. No. 111–21, 123 Stat. 1617, may suggest a more rigorous application of lenity than prior cases.

Many state courts follow the Supreme Court's *Moskal* formulation of the rule of lenity. Price, 72 Fordham L. Rev. at 891. The incorporation of the *Moskal* approach in state courts, however, has sometimes been questioned. *See State v. Lutters*, 853 A.2d 434, 447–48 (Conn. 2004) (Zarella, J., concurring) ("[T]his court's continued reference to the language of *Moskal* is unwarranted in the absence of its own examination of whether the use of extratextual sources to clarify an ambiguous statute is consistent with the principle of fair warning.").

Although we have many cases citing and applying the rule, our cases tend to be conclusory, less than nuanced, and arguably inconsistent. *Compare Muhlenbruch*, 728 N.W.2d at 216 (invoking the rule of lenity without reference to public policy of combating child pornography or legislative history), *with Hagedorn*, 679 N.W.2d at 670 (citing public policy of preventing domestic violence not manifest in statutory language as alternate rationale for broad construction of burglary statute), *and Lenertz v. Mun. Ct.*, 219 N.W.2d 513, 516 (Iowa

1974) (considering legislative history in determining that consumer fraud provision did not impose criminal sanction). These cases have an ad hoc quality and suggest that we have sometimes sought to avoid the rule of lenity through construction and sometimes embraced it rather quickly. Because extrinsic legislative history in Iowa is generally sparse, our cases rarely discuss such materials in reaching an authoritative construction of a criminal statute. We have also not directly addressed whether a heightened level of ambiguity, or "grievous ambiguity," is required to invoke the rule. *See State v. Finders*, 743 N.W.2d 546, 549 (Iowa 2008) (stating statute was not a "model of clarity" yet was not ambiguous, and even if it were ambiguous, obvious public policy underlying legislative intent would control); *see also* Kahan, 1994 Sup. Ct. Rev. at 384 (noting that "what counts as 'ambiguity' for purposes of the rule" is a question that "does not answer itself").

At a minimum, however, our cases stand for the proposition that the rule of lenity does not apply if there is no ambiguity regarding the application of a statute to a given set of facts after examination of the text, the context of the statute, and the evident statutory purpose as reflected in the express statutory language. For the reasons expressed above, we are convinced the term "pursuer," as applied to this case, is not ambiguous. Given the straightforward language used and the obvious legislative purpose, we see no appreciable risk that a defendant would be without fair notice that conduct like that in this case could give rise to additional criminal liability, no risk of arbitrary or selective criminal enforcement based on political, racial, or other bias, virtually no risk that we have violated separation of powers by extending criminal liability beyond that contemplated by the legislature, and no undermining of democratic responsiveness.

We are thus not violating the time-honored rule that criminal liability cannot be expanded beyond express legislative terms by construction or implication. *State v. Lovell*, 23 Stiles 304, 305 (Iowa 1867). Indeed, we have the exact opposite situation in this case. While we recognize that penal statutes are inelastic, *Nelson*, 178 N.W.2d at 437, this does not mean the legislature is prohibited from using unqualified language in criminal statutes. In this case, we simply decline to narrow a broad legislative formulation by implying or constructing limitations not present in the statute and undercutting its obvious public purpose. *See Hagedorn*, 679 N.W.2d at 669; *Nelson*, 178 N.W.2d at 437 (stating that criminal statutes "are not to be construed so strictly as to defeat the obvious intention of the Legislature"); 3 Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction*, § 59:3, at 167–68 n.1 (7th ed. 2008) (citing *State v. Schramel*, 581 N.W.2d 400, 403 (Minn. Ct. App. 1998) ("Although a penal statute must be strictly construed, that does not justify a court to use restrictive language that is not there.")).

In sum, we conclude that there was substantial evidence that Hearn aided and abetted the carjacking and thus cannot escape his conviction of felony eluding on the ground that he was not participating in an underlying felony. Further, we conclude that when police officers responding to a contemporaneous crime report come upon the accused in close temporal and geographic proximity to the crime and give chase, the police officers are "pursuers" under Iowa Code section 702.13. As a result, Hearn's challenge to his felony eluding conviction on the ground that pursuers under the statute must be in continuous pursuit from the scene of the crime cannot be sustained.

**IV. Conclusion.**

Although circumstantial, substantial evidence supports Hearn's convictions for second-degree robbery and second-degree theft. Substantial evidence also supports Hearn's conviction for felony eluding because Hearn was participating in a felony and had not eluded pursuers at the time of the police chase giving rise to the charge. As a result, the judgment of the district court is affirmed.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Wiggins and Hecht, JJ., who concur in part and dissent in part, and Mansfield, J., who takes no part.

**WIGGINS, Justice (concurring in part and dissenting in part).**

I concur in part and dissent in part with the majority's decision. I concur with the majority's conclusion that substantial evidence supported the verdict finding Hearn aided and abetted robbery and theft. I part ways with the majority's conclusion that Hearn is guilty of felony eluding under the legislative scheme concerning the law of eluding.

The majority lost its way when it broadly defined the word "pursuer," analogized our eluding statute to the hot-pursuit statute, and turned the rule of lenity on its head. What the majority failed to consider anywhere in its decision is the statutory scheme devised by our legislature regarding the crime of eluding.

The goal of statutory interpretation is to determine legislative intent. *Auen v. Alcoholic Beverages Div.,* 679 N.W.2d 586, 590 (Iowa 2004). When interpreting a statute, we are required to assess a statute in its entirety, not just isolated words or phrases. *State v. Young*, 686 N.W.2d 182, 184–85 (Iowa 2004). Indeed, "we avoid interpreting a statute in such a way that portions of it become redundant or irrelevant." *T & K Roofing Co. v. Iowa Dep't of Educ.,* 593 N.W.2d 159, 162 (Iowa 1999). We look for a reasonable interpretation that best achieves the statute's purpose and avoids absurd results. *Harden v. State*, 434 N.W.2d 881, 884 (Iowa 1989). Under the pretext of interpretation, we "may not extend, enlarge, or otherwise change the meaning of a statute." *Auen*, 679 N.W.2d at 590. Finally, we strictly interpret criminal statutes with doubts resolved in the defendant's favor. *State v. Gonzalez,* 718 N.W.2d 304, 308 (Iowa 2006).

To understand the basis for my dissent, it is necessary to review the entire legislative scheme for the crime of eluding. The statute provides:

> 1. The driver of a motor vehicle commits a serious misdemeanor if the driver willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle driven by a uniformed peace officer after being given a visual and audible signal to stop. The signal given by the peace officer shall be by flashing red light, or by flashing red and blue lights, and siren. For purposes of this section, "*peace officer*" means those officers designated under section 801.4, subsection 11, paragraphs "*a*", "*b*", "*c*", "*f*", "*g*", and "*h*".
>
> 2. The driver of a motor vehicle commits an aggravated misdemeanor if the driver willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle that is driven by a uniformed peace officer after being given a visual and audible signal as provided in this section and in doing so exceeds the speed limit by twenty-five miles per hour or more.
>
> 3. The driver of a motor vehicle commits a class "D" felony if the driver willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle that is driven by a uniformed peace officer after being given a visual and audible signal as provided in this section, and in doing so exceeds the speed limit by twenty-five miles per hour or more, and if any of the following occurs:
>
> *a.* The driver is participating in a public offense, as defined in section 702.13, that is a felony.
>
> *b.* The driver is in violation of section 321J.2 or 124.401.
>
> *c.* The offense results in bodily injury to a person other than the driver.

Iowa Code § 321.279 (2009). Section 321.279(3)(*a*) incorporates the statutory definition of "participating in a public offense" contained in section 702.13 as an element of the crime. Section 702.13 defines "participating in a public offense" as the defendant's conduct

> during part or the entire period commencing with the first act done directly toward the commission of the offense and

> for the purpose of committing that offense, and terminating when the person has been arrested or has withdrawn from the scene of the intended crime and has eluded pursuers, if any there be.

*Id.* § 702.13.

The statutory scheme chosen by the legislature makes it very clear that the classification grades for the crime of eluding is based on the increasing potential of harm to the public. Situations with the least potential of harm are when a driver of a vehicle "willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle driven by a uniformed peace officer after being given a visual and audible signal to stop." *Id.* § 321.279(1). Under these circumstances, the driver commits a serious misdemeanor. *Id.*

> Situations with a greater potential of harm are when
>
> the driver willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle that is driven by a uniformed peace officer after being given a visual and audible signal as provided in this section and in doing so exceeds the speed limit by twenty-five miles per hour or more.

*Id.* § 321.279(2). The legislature knew that a driver exceeding the speed limit by twenty-five miles per hour or more is more likely to cause injury to other persons and property than a driver who simply fails to stop and does not drive at an excessive speed. Thus, the legislature classified this type of eluding as an aggravated misdemeanor. *Id.*

Finally, situations involving the greatest potential of harm and situations that cause actual harm occur when

> the driver willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle that is driven by a uniformed peace officer after being given a visual and audible signal as provided in this section, and in doing so exceeds the speed

limit by twenty-five miles per hour or more, and if any of the following occurs:

> *a.* The driver is participating in a public offense, as defined in section 702.13, that is a felony.

> *b.* The driver is in violation of section 321J.2 or 124.401.

> *c.* The offense results in bodily injury to a person other than the driver.

*Id.* § 321.279(3). Under these situations, the legislature has declared eluding to be a class "D" felony. *Id.*

One way felony eluding occurs is when the driver willfully fails to bring his or her vehicle to a stop and exceeds the speed limit by twenty-five miles per hour or more, while participating in a felony. *Id.* Participating in a felony terminates "when the person has been arrested or has withdrawn from the scene of the intended crime and has eluded pursuers." *Id.* § 702.13. The majority makes a wrong turn in its analysis, by giving "pursuers" a broad definition rather than a narrow one, as required by the legislative scheme. I am convinced the legislative scheme indicates a legislative intent that to be guilty of felony eluding, continuous pursuit from the crime scene is required.

I agree with the majority that a "pursuer" is a "one that chases or follows after." *Webster's Third New International Dictionary* 1848 (unabr. ed. 2002). A police officer is always pursuing bad guys. For example, officers on routine patrol are continuously running license plates to determine if a vehicle is stolen. If an officer runs a plate, determines the vehicle is stolen, and gives chase, under the broad definition of pursuer, the driver is guilty of felony eluding if the driver willfully fails to bring the vehicle to a stop and exceeds the speed limit by twenty-five miles per hour or more.

Moreover, the majority's interpretation of the statute gives a jury no guidance as to when the officer is in pursuit. Is the officer in pursuit based on how far away he or she may be from the scene? Does the jury determine whether the officer was in pursuit by how much time has passed between the commission of the crime and when the officer observed the vehicle? Is it a combination of both time and distance? By applying the majority's analysis, can a person be guilty of felony eluding if the officer learns of a stolen vehicle and encounters the vehicle an hour later? I think so. Thus, a judge has no way to instruct the jury and the jury has no way to differentiate between felony eluding and aggravated misdemeanor eluding.

In addition, we are required to interpret a statute so it is constitutional. *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010). Under the majority's interpretation, what notice does the statute give a citizen as to when an eluding changes from a misdemeanor to a felony? Does the majority's interpretation create a due process problem? I think so.

It is clear to me the legislative scheme requires continuous pursuit to establish felony eluding. A situation involving continuous pursuit has the most potential to cause severe harm. Criminals will do unpredictable things when confronted by the police at a crime scene. The victims of the crime and innocent bystanders are more prone to be injured by a desperate criminal trying to flee the scene of a crime. Therefore, felony eluding under 321.279(3)(*a*) should be reserved for those situations when the officer confronts a criminal at the scene. Thus, if the defendant has withdrawn from the scene without an officer pursuing him or her, the defendant is guilty of aggravated misdemeanor eluding. This interpretation not only gives juries and defendants a bright-line rule

differentiating between felony eluding and aggravated misdemeanor eluding, but also is consistent with the rule of lenity requiring us to interpret criminal statutes strictly, with doubts resolved in the defendant's favor. *Gonzalez*, 718 N.W.2d at 308.

At the time the officer began the chase, Hearn had withdrawn from the scene of the crime, without any person pursuing him. Neither the victim nor any innocent bystanders at the scene of the crime were in any danger due to this high-speed chase. Consistent with the legislative scheme, I would find Hearn guilty of aggravated misdemeanor eluding.

As a result, I would vacate the decision of the court of appeals, reverse the judgment of the district court, remand the case to the district court to enter judgment against the defendant for aggravated misdemeanor eluding, and resentence the defendant accordingly.

Hecht, J., joins this concurrence in part and dissent in part.